**KEY BANK OF PUGET SOUND, Plaintiff,**

v.

**ALASKAN HARVESTER, Official Number 236979, her engines, tackle, equipment, and appurtenances, In Rem; and Alaskan Harvester Fisheries Partnership, et al., In Personam, Defendants.**

No. C89–814Z.

United States District Court,
W.D. Washington, N.D.
at Seattle.

Dec. 21, 1989.

Bruce Allen King and Jonathan Rodriguez–Atkatz, Bogle & Gates, Seattle, Wash., for plaintiff.

Dwight L. Guy, Law Office of Dwight L. Guy, Seattle, Wash., for Alaskan Harvester, Alaskan Harvester Fisheries Partnership, Alaskan Harvester Management, Inc., Lynn Miller, Inc., Craig Larson and Mary Lu Larson.

John Henry Darrow, Ruthford & Woodbery, Kirkland, Wash., for SAS Fishing, Inc.

Dillon E. Jackson, Hatch & Leslie, Seattle, Wash., for Lynn B. Miller and Margurette Miller.

Steven F. Brault, Weinstein, Hacker, Matthews & Young, Seattle, Wash., for Craig Larson and Mary Lu Larson.

Milton Henry Doumit, Jr., Ogden, Murphy & Wallace, Seattle, Wash., for Food Services of America, Inc.

Julie Marshall Johnson, Mikkelborg, Broz, Wells & Fryer, Seattle, Wash., for Harbor Enterprises, Inc., Shoreside Petroleum, Inc.

John Craig Bjorkman, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, Wash., for Teknotherm, Inc.

William Craig Smith, Law Offices of Craig Smith, Seattle, Wash., for Marco Seattle, Inc.

Lynn Bahrych Squires, Maritime Law Offices of Squires & Farrell, Seattle, Wash., for Western Pioneer, Inc. d/b/a Delta Western, Offshore Systems, Inc., Greenwood Travel.

James A. Wexler, Williams, Kastner & Gibbs, Seattle, Wash., for Jon Gunnarsson.

Walter H. Hageman, Jr., Law Office of Walter H. Hageman, Jr., Seattle, Wash., for Ballard Sheet Metal Works, Inc.

John Craig Bjorkman, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, Wash., for Preston, Thorgrimson, Ellis & Holman, Teknotherm, Inc.

Joseph David Weinstein, Davis Wright Tremaine, Seattle, Wash., for Watarai Shoten Co., Ltd. (also third-party plaintiff).

James A. Wexler, Williams, Kastner & Gibbs, Seattle, Wash., for Jon Gunnarsson.

## ORDER ON ALL PENDING MOTIONS FOR SUMMARY JUDGMENT AND LEAVE TO INTERVENE, AND ORDER OF SALE

ZILLY, District Judge.

THIS MATTER comes before the Court upon the motions of numerous maritime lienors against the defendant fishing vessel, the ALASKAN HARVESTER. This Court has reviewed the entire record herein and, finding good cause therefor, rules as follows: (1) The motion for summary judgment and for an order of foreclosure and sale of vessel (docket no. 90) by plaintiff Key Bank of Puget Sound ("Key Bank") is GRANTED; (2) The motion for summary judgment (docket no. 126) by intervening plaintiff Watarai Shoten Co., Ltd. ("Watarai") is DENIED; (3) The application to intervene (docket no. 115) by claimant Jon Gunnarsson is GRANTED; and (4) The application to intervene (docket no. 146) by claimant Ballard Sheet Metal Works, Inc. ("Ballard Sheet Metal") is DENIED.

### I.

#### Statement of Facts

On June 1, 1989, plaintiff Key Bank, filed a complaint *in rem* against the ALASKAN HARVESTER and *in personam* against her owners and operators.[1] This Court ordered the arrest of the defendant vessel that same day. Key Bank holds a promissory note and preferred mortgage on the ALASKAN HARVESTER in trust for a Norwegian bank, Christiania Bank og Kreditkasse ("Christiania"). Key Bank alleges the amount owing under the mortgage is

---

1. The defendants *in personam* are Alaskan Harvester Fisheries Partnership; Alaskan Harvester Management, Inc.; Lynn Miller, Inc.; S.A.S. Fishing, Inc.; Lynn B. Miller, Margurette Miller; Craig D. Larson; and Mary Lu Larson (collectively, "defendants").

$2,462,500.00 in principal, plus late charges, accrued interest, and related expenses.

Numerous claims have been made against the defendant vessel since its arrest, and eight claimants have been allowed to intervene as plaintiffs in this action.[2] On August 2, 1989, this Court entered an order of default *in rem.* Since that order, Watarai has been allowed to intervene and two additional applications for intervention have been filed by former ALASKAN HARVESTER crew member Jon Gunnarsson and by marine supplier Ballard Sheet Metal.

Key Bank moves for summary judgment and requests entry of an order of foreclosure and sale of vessel. This summary judgment is not opposed by defendants. However, three intervening plaintiffs oppose Key Bank's motion, and a fourth intervenor, Watarai, has filed its own motion for summary judgment.

## II.

### Summary Judgment

In reviewing a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. If direct evidence by the moving party conflicts with the non-moving party's direct evidence, the Court must assume the truth of the latter with respect to that fact. Inferences must also be drawn in the light most favorable to the non-moving party. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *United Steelworkers v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989).

The burden is initially on the moving party to identify the materials on file that

demonstrate the absence of any genuine issue of material fact. *T.W. Electrical Service, Inc.,* 809 F.2d at 630. Once the initial burden is satisfied, the party opposing a motion for summary judgment must set forth specific facts "such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *Id.* at 631; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. *Key Bank's Motion for Summary Judgment*

Plaintiff Key Bank moves for summary judgment declaring it the holder of a preferred mortgage on the ALASKAN HARVESTER and her appurtenances in the principal amount of $2,462,500.00, plus interest and other amounts, and that its preferred mortgage lien is senior in priority to all claims against the defendant vessel. Key Bank also seeks entry of an order of foreclosure and sale of the defendant vessel, and leave of court to participate in bidding on the same. The proposed order submitted by Key Bank would allow it to bid its judgment in lieu of cash at the foreclosure sale.

No party disputes that Key Bank's mortgage satisfies the statutory requirements of a preferred mortgage under the Ship Mortgage Act, 46 U.S.C. § 911 *et seq.* (1982), *repealed and recodified as amended at* 46 U.S.C. § 30101 *et seq.* (effective Jan. 1, 1989). The record indicates that on July 27, 1988, defendants executed a promissory note in principal amount of $2,462,-500 in favor of Christiania. *See* Eriksen Aff., Exh. A. The loan agreement included a first preferred ship mortgage. *See* id. On August 4, 1988, that mortgage was filed, recorded, and endorsed on the ALASKAN HARVESTER's Certificate of Ownership. 46 U.S.C. § 922, *recodified at* 46 U.S.C. § 31321; *see also* Russell Aff., Exh. D. Key Bank is therefore entitled to summary judgment with respect to the validity of its preferred mortgage.

---

**2.** They are, Food Services of America, Inc.; Greenwood Travel; Offshore Systems, Inc.; Western Pioneer, Inc.; Harbor Enterprises, Inc.; Shoreside Petroleum, Inc.; Teknotherm (U.S.) Inc.; and Marco Seattle, Inc.

Intervenors Greenwood Travel, Western Pioneer, Inc. and Offshore Systems, Inc. (collectively, "objecting intervenors") initially opposed summary judgment on grounds that it was premature and that additional discovery was necessary. Key Bank dismissed those concerns as procedurally improper and lacking substantiation. The intervenors' objections are moot insofar as requested discovery has now taken place and the parties have supplemented their briefings.

■ The objecting intervenors also take exception to Key Bank's proposed cashless bidding and object that the proposed order will effectively terminate the claims of all other parties. The substance of their opposition is that the market for vessels such as the ALASKAN HARVESTER is currently distressed and that the sale is not likely to attract a bid greater than the outstanding mortgage held by Key Bank. The sole source for this claim is an unattributed hearsay statement set forth in the affidavit of intervenors' attorney. *See* Squires Aff., at ¶ 5.

The objecting intervenors' concerns are not well taken. A mortgagee is statutorily authorized to participate in the foreclosure sale, and leave of court is not required. 46 U.S.C. § 31329(a)(2). Moreover, the hearsay evidence contained in intervenors' affidavit is inadmissible and may not be considered by this Court on review of summary judgment. *See Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 667 (9th Cir.1980). Even if such evidence were admissible, this Court does not find the intervenors' objections persuasive insofar as there appears no logical connection between a cash sale requirement and a higher sale price.

The objecting intervenors raise two additional issues in supplemental briefings they submitted following initial discovery. First, they dispute the dollar amount secured by Key Bank's preferred mortgage.

However, the intervenors fail to point to specific facts to refute those offered by Key Bank, and thus they fail to raise an issue of genuine dispute. *See Bennett v. Campbell,* 564 F.2d 329, 331 (9th Cir.1977).

■ Second, the objecting intervenors dispute the superiority of Key Bank's lien. The preferred mortgage lien has priority over all claims against the defendant vessel except claims for unpaid wages and other claims not relevant here. 46 U.S.C. § 31326(b)(1). The objecting intervenors hold maritime liens for necessaries they supplied to the ALASKAN HARVESTER between December 1988 and June 1989.[3] 46 U.S.C. § 31342.

The objecting intervenors assert that Christiania's preferred mortgage was in default as of November 1988, that the bank unfairly delayed until May 1989 in declaring the default, and that the intervenors were injured by the delay. Thus, they urge this Court to apply the doctrine of equitable subordination and resolve priority disputes contrary to the statutory scheme. *See Wardley Intern. Bank, Inc. v. Nasipit Bay Vessel,* 841 F.2d 259 (9th Cir.1988).

In *Wardley,* the Ninth Circuit held that three conditions are necessary to justify the equitable subordination of an otherwise valid claim: (1) the claimant has engaged in inequitable conduct; (2) the misconduct has resulted in injury to the competing claimants or has conferred an unfair advantage on the claimant; and (3) subordination is not inconsistent with federal law. *Wardley,* 841 F.2d at 263 (citing *Custom Fuel Services, Inc. v. Lombas Industries, Inc.,* 805 F.2d 561, 566 (5th Cir.1986)).

Key Bank does not take issue with the second and third *Wardley* requirements; however, it strenuously denies that Christiania's conduct was "inequitable." Key Bank concedes that Christiania abandoned its mortgage payment schedule from the outset of the loan, but argues that the leniency Christiania showed defendant

---

**3.** Greenwood Travel asserts claims totalling $23,094.17 for necessaries provided between April 5 and May 19, 1989; Western Pioneer, Inc. asserts claims totalling $23,647.12 for necessaries and services provided between Dec. 30,

1988 and April 7, 1989; and Offshore Systems, Inc. asserts claims totalling $57,919.24 for necessaries and services provided between Dec. 28, 1988 and June 1, 1989.

mortgagors, a start-up company, was appropriate and does not rise to the level of misconduct warranting subordination. This Court must decide whether the intervenors have raised a genuine dispute of material fact sufficient to preclude summary judgment.

The record reflects that in July 1988 Christiania advanced to defendants $2,462,-500 to fund the purchase and conversion of the ALASKAN HARVESTER. *See* Eriksen Aff., Exh. A. The first principal payment of $61,000 was due November 1, 1988. *See* id. At defendants' request, Christiania extended payment of that installment until February 1, 1989, when the next principal payment was due. *See* Eriksen Supp. Aff., Exh. 1; Farrell Supp. Aff., Exhs. D, E. When defendants missed both payments, Christiania agreed to forbear from declaring a default in return for payment of $77,739.76, representing accrued interest through February 1, 1989. *See* Eriksen Supp. Aff., Exh. 2. Following a third missed payment, due May 1, 1989, Christiania declared the loan in default. *See* Farrell Supp. Aff., Exh. I. This action was commenced one month later.

The Ninth Circuit declined in *Wardley* to delineate what type of conduct by a mortgagee was sufficiently inequitable to justify subordination of its mortgage lien. The facts of that case are clearly much more egregious than the conduct complained of here. In *Wardley,* the mortgagee held a promissory note that was more than three times the outstanding debt. The mortgagee "essentially finagled a gratuitous security interest of over three million dollars." *Wardley,* 841 F.2d at 263. The mortgagee was also able to extend its rights in the vessel for five years beyond actual repayment of the loan and forced the mortgagor to guarantee a thirteen million dollar debt of a third company. *Wardley* concluded that the circumstances warranted a departure from the statutory scheme, and thus the mortgage lien was subordinated in favor of the other liens.

A Fifth Circuit opinion, cited with approval in *Wardley,* identifies three categories of inequitable conduct that justify sub-ordination: " '(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego.' " *Custom Fuel Services, Inc. v. Lombas Industries, Inc.,* 805 F.2d 561, 566 (quoting *Matter of Missionary Baptist Foundation, Inc.,* 712 F.2d 206, 212 (5th Cir.1983)). Other courts have subordinated mortgages under similar circumstances. *See, e.g., Security Pac. Nat'l Bank v. OL.s. Pacific Pride,* 549 F.Supp. 53, 54 (W.D.Wash.1982) (Beeks, J.) (part owners, joint venturers, or stockholders cannot hold liens on vessel in which they own an interest); *Equilease Corp. v. M/V Samson,* 568 F.Supp. 1259, 1264 (E.D.La.1983) (mortgage given by subsidiary to its parent was a sham), *rev'd on other grounds,* 793 F.2d 598 (5th Cir.), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986).

The objecting intervenors cite a Louisiana district court opinion and suggest that subordination may be appropriate under facts presented here. In *Cantieri Navali Riuniti v. M/V Skyptron,* 621 F.Supp. 171 (W.D.La.1985), *aff'd in part and rev'd in part,* 802 F.2d 160 (5th Cir.1986), the court quoted the following passage from a admiralty treatise:

> Assume that a mortgagee knows that his mortgagor is insolvent and also knows that the mortgagor, if he continues to operate the vessel, will necessarily run up large bills for supplies and repairs which he will be unable to pay under the ordinary course of business. If, under such circumstances, after default, the mortgagee allows the mortgagor to continue his operations, there would be good reason to hold that the mortgage had lost its priority over the post-mortgage liens.

*Cantieri,* 621 F.Supp. at 187, *quoting* G. Gilmore & C. Black, *The Law of Admiralty* § 9–84 (2d ed. 1975).

As an initial matter, it should be noted that the *Cantieri* court's analysis is strictly dictum. Faced with a choice of law question between U.S. and foreign law, the court addressed the order of lien preference under both "[s]o that we need not

re-try this case should the Court of Appeals reverse on this point...." *Cantieri,* 621 F.Supp. at 181 n. 2. The court went on to conclude that foreign law applied, and that portion of the decision was affirmed on appeal. *See* 802 F.2d 160 (5th Cir.1986). The opinion is cited in *Wardley* without comment. *See Wardley,* 841 F.2d at 264.

The *Cantieri* holding, moreover, is not as broad as the passage it quotes. Indeed, the court focused its analysis on factors more familiar to those cited in *Wardley* and *Custom Fuel.* Specifically, the *Cantieri* court noted that an employee of the mortgagee shared office space with its borrowers and was "intimately familiar" with the latter's financial problems. The court was particularly impressed by the fact that the mortgagee was aware of the mortgagor's default, and though it was entitled to take possession without judicial proceedings, it nonetheless waited *nearly two years* before foreclosing. *Cantieri,* 621 F.Supp. at 187 (Mortgagee "was close enough to hear the financial wolves at [mortgagor's] door."). Under these facts, the district court had little problem concluding that the mortgage lien should be subordinated in favor of liens that arose during the two-year period of default.

Even accepting this dictum as an accurate statement of law, this Court concludes the case is readily distinguishable on the very facts that the Louisiana court found persuasive. First, the duration of default in *Cantieri* was nearly two years while only six months elapsed between the first scheduled payment and the declaration of default in this case. Indeed, the first principal payment was extended the day before it was due; hence, the mortgage was not truly in default until February 1, 1989, when the second payment was missed. *See* Eriksen Aff., Exh. A. Second, no evidence is offered here approximating the degree of intimacy between the mortgagee and the mortgagor that impressed the court in *Cantieri.* For these reasons this Court finds the case of limited value, especially when compared to the precedents in *Wardley* and *Custom Fuel.*

Common to the Ninth Circuit's review in *Wardley* and the Fifth Circuit's in *Custom Fuel* is the notion that the mortgagee achieved the superior position of its lien by "[a] contrived financial scheme ... [that] effectively destroys the liens of suppliers and subverts the purposes of the Maritime Liens Act." *Wardley,* 841 F.2d at 264; *see also Custom Fuel,* 805 F.2d at 567 ("Our examination of the transaction ... reveals that the mortgage is a sham."). There is no evidence presented in this case to support such an allegation, drawing all inferences in favor of the objecting intervenors. The intervenors have failed therefore to demonstrate the existence of a genuine issue for trial. Accordingly, summary judgment is granted in favor of Key Bank.

### 2. *Watarai's Motion for Summary Judgment*

■ Watarai is a Japanese fishing concern. It contracted with defendants to process fish caught by the ALASKAN HARVESTER and to market the resulting product. Watarai claims that it provided the ALASKAN HARVESTER with a piece of equipment, known as a "net recorder", worth an estimated $15,000.[4]

Watarai initially opposed Key Bank's motion for summary judgment on grounds that the foreclosure sale should not include the net recorder. It later filed its own motion for summary judgment declaring the net recorder property of Watarai and ordering its return. Watarai ultimately withdrew its opposition to Key Bank's summary judgment motion on the condition that the net recorder be removed from the defendant vessel while reserving the issue of ownership.

A factual dispute exists with respect to Watarai's ownership interest in the net recorder. Watarai alleges in its complaint that it "purchased" the net recorder from an unrelated third-party, Furuno U.S.A., Inc. ("Furuno"), and "provided" it to the

---

**4.** Watarai also asserts liens for necessaries in excess of $193,400. It does not assert those claims on summary judgment.

ALASKAN HARVESTER to improve the vessel's fishing capabilities. *See* Watarai Complaint, at p. 4. However, the invoice attached as an exhibit to Watarai's complaint lists the ALASKAN HARVESTER's owners as responsible for billing. *See* id., Exh. E (invoice dated April 26, 1989).

In its opposition to Key Bank's motion for summary judgment, Watarai claimed that it "guaranteed" payment to Furuno. *See* Watarai Opp. Memo, p. 2. This claim conflicts with the sworn statement of Watarai's U.S. representative that the company "lent" the equipment to the ALASKAN HARVESTER but "retained all ownership interest" therein. *See* Miura Aff., p. 2. Watarai ultimately submitted a receipt, dated September 21, 1989, showing its purchase of the net recorder for $1,200 more than was stated on the April 1989 invoice. *See* Miura Supp. Aff., Exh. A.

The dispositive issue is whether Watarai was the actual owner of the net recorder at the time of the vessel arrest. *See Ocean Recovery Group v. O/S Northern Retriever*, 1983 A.M.C. 262, 265–66 (D.C.Alaska 1982) (distinguishing between lease agreements and conditional sales contracts). Key Bank opposes Watarai's summary judgment motion. Viewing the evidence in the light most favorable to Key Bank, the non-moving party, there exists a dispute of material fact concerning the nature of Watarai's ownership interest in the net recorder and when that interest arose. Accordingly, Watarai's motion for summary judgment is denied. The custodian shall be directed to remove the net recorder from the ALASKAN HARVESTER and to store it in a safe place pending further litigation of Watarai's claim. *See supra* section IV.

### III.

#### Applications to Intervene

Three claimants have applied for leave to intervene since August 2, 1989, when this Court entered an order declaring all persons with *in rem* claims against the ALASKAN HARVESTER who had not then appeared were in default. Prior to the August 2 order, notice of the vessel's arrest and the pendency of this litigation were given by publication, and all persons with claims therein were advised to appear within ten days. *See* Rule C, Supp. Rules for Certain Admiralty and Maritime Claims; LAR 130, Supp. Admiralty Rules. On September 25, 1989, this Court granted intervenor Watarai's unopposed motion to intervene. Two additional claimants have applied for leave to intervene.

##### 1. *Gunnarsson's Application to Intervene*

Former ALASKAN HARVESTER crew member Jon Gunnarsson moves for leave to intervene to assert a claim of $24,890.38 for unpaid wages. Through his attorney, Gunnarsson sent demand letters to defendants on May 4, 1989, and again on June 6, 1989. *See* Gunnarsson Aff., Exhs. A, B.

Gunnarsson filed his application for intervention on September 22, 1989, seven weeks after the entry of default. Key Bank does not dispute the validity of Gunnarsson's wage claim; however, it opposes intervention on grounds that Gunnarsson's application is untimely. The significance of Gunnarsson's claim is that liens for unpaid wages are deemed senior to virtually all liens, including preferred mortgage liens. 46 U.S.C. § 31326(b)(1).

Gunnarsson asks the Court to excuse his delay. He represents that he had no knowledge of the ALASKAN HARVESTER's arrest on June 6, 1989, and that on June 22, 1989, he flew to Alaska to work on board a vessel participating in the oil spill cleanup in Prince Williams Sound. Gunnarsson further represents that he first learned of the vessel arrest on August 25, 1989. Gunnarsson does not explain his four-week delay in filing this application.

Key Bank correctly points out that Fed. R.Civ.P. 24 governing intervention requires that applications be "timely." *See also United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir.1986). However, Rule C requiring that all *in rem* claims be filed within ten days of notice of the vessel arrest expressly authorizes the district court to allow such additional time as it

deems appropriate.[5] The Ninth Circuit's discussion in *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432 (9th Cir. 1985), a government forfeiture action, is relevant here:

> Although the discretion to grant additional time [under Rule C] would normally be exercised at or shortly after the time process is executed, nothing in the Rule imposes a time limit on the exercise of that discretion. Of course, the court's discretion is not unbounded. *It should only exercise its discretion to grant additional time where the goals underlying the time restriction ... are not thwarted.*
>
> The purpose of the time limit is to force claimants to come forward as soon as possible after forfeiture proceedings have been initiated so that all interested parties can be heard and the dispute resolved without delay.

*Yukon Delta*, 774 F.2d at 1435–36 (emphasis added, footnotes omitted).

Gunnarsson acted with apparent diligence in seeking redress from his employers and, subsequently, in applying to intervene in this action. Moreover, this Court is cognizant of the special treatment historically accorded to liens for seamen wages. Such liens have been described as "sacred and indelible," *Sheppard v. Taylor*, 30 U.S. (5 Pet.) 675, 710, 8 L.Ed. 269 (1831), and are entitled to be paid "as long as a plank of the ship remains." *The John G. Stevens*, 170 U.S. 113, 119, 18 S.Ct. 544, 547, 42 L.Ed. 969 (1898); *see generally* M. Norris, *The Law of Seamen* § 20:6 (4th ed. 1985). Accordingly, Gunnarsson's application for leave to intervene is granted.

### 2. *Ballard Sheet Metal's Application to Intervene*

■ On November 21, 1989, Ballard Sheet Metal Works, Inc. ("Ballard Sheet Metal") filed an application for leave to intervene. Ballard Sheet Metal advances a lien for supplies and necessaries in the amount of $10,110.28. The application was supported by neither memoranda nor affidavits at the time it was filed. A subsequently filed memorandum failed to identify any specific facts pertaining to the nearly four month delay in filing. The intervention is opposed by plaintiff Key Bank. In view of the applicant's failure to present any evidence explaining its tardy prosecution of its claim, its application for leave to intervene is denied. *See* Fed.R. Civ.P. 24.

### IV.

#### Order of Sale

What remains is the order of foreclosure and sale of the ALASKAN HARVESTER. Plaintiff Key Bank has submitted a proposed order which, as some intervenors correctly point out, does not specify any order of lien preference other than in relation to its own preferred mortgage lien. Key Bank has, however, filed a stipulation with this Court providing that if it bids its judgment in lieu of cash, it agrees to pay all lien claims hereafter determined by the Court to be valid and enforceable liens and senior in priority to the bank's preferred mortgage. There also remains the unresolved matter of Watarai's claim to the net recorder.

The ALASKAN HARVESTER is incurring significant custodian, moorage, and related expenses which will ultimately reduce the amount available for distribution. Mindful of this fact, the Court ORDERS the sale of the defendant vessel, the ALASKAN HARVESTER, Official No. 236979, and her appurtenances (the "Vessel"), under the following conditions:

1. Prior to the sale of the defendant Vessel, the custodian is ORDERED to remove therefrom the Furuno Net Recorder, serial no. 618–0381, and to store the same in a place of safekeeping pending further order of this Court. All claims against the net recorder shall be reserved for later determination by this Court.

---

**5.** Rule C(6) provides in relevant part: "The claimant of property that is the subject of an action in rem shall file a claim within 10 days after process has been executed, *or within such additional time as may be allowed by the court*, and shall serve an answer within 20 days after the filing of the claim." (emphasis added).

2. Plaintiff Key Bank is awarded summary judgment:

(a) *In rem* against the Vessel on its July 27, 1988 First Preferred Ship Mortgage thereon (the "Mortgage") in the amount of $2,462,500.00 in principal; $208,142.54 in interest as of August 22, 1989; further accrued and accruing interest as set forth in the promissory note, the form of which is attached to the Mortgage, and which will be further liquidated by this Court; $6,160.00 in late charges; $11,250.00 in insurance premiums; $300.00 in trustee's fees; and such further expenses, costs, and attorneys' fees as this Court may subsequently award.

(b) That the Mortgage is, and since 4:55 P.M. P.D.T. August 4, 1988 has been (i) a preferred mortgage on the Vessel within the meaning of the Ship Mortgage Act, 1920, as amended, and Chapter 313 of Title 46 of the U.S.Code, and (ii) a valid, perfected and enforceable maritime lien on the Vessel.

(c) That the interest of the plaintiff in the Vessel and the proceeds of the sale, release, or other disposition is senior to any and all interests therein of Food Services of America, Inc., Greenwood Travel, Offshore Systems, Inc., Western Pioneer, Inc., Harbor Enterprises, Inc., and Shoreside Petroleum, Inc., Teknotherm (U.S.) Inc., Marco Seattle, Inc., and Watarai Shoten Co., Ltd.

(d) That the priority and amount of the claim advanced by intervenor Jon Gunnarsson or any other claimant allowed by the Court to participate in these proceedings shall be reserved for later determination by the Court.

3. That the Vessel is hereby condemned and the United States Marshal of this District is hereby directed to sell the Vessel on a day arranged by plaintiff and the Marshal, following advertisement of the sale of the Vessel as required by LAR 145(a), the cost of which shall be an administrative cost herein.

4. That the sale shall be conducted according to the following terms:

(a) The sale shall be to the highest bidder who must, at the sale, deposit with the Marshal, in cash or by a cashier's or certified check issued by a member bank of the Federal Reserve System, the greater of $500 or 10% of the bid and pay the balance due, in cash or by a cashier's or certified check issued by a member bank of the Federal Reserve System, within three days thereafter, excluding Saturdays, Sundays and legal holidays. If an objection to the sale is filed within that time, the bidder is excused from paying the balance of the purchase price until the sale is confirmed, and for a period of three days thereafter, excluding Saturdays, Sundays and legal holidays. If no written objection is filed within three days of the date of sale, excluding Saturdays, Sundays and legal holidays, the sale will be confirmed as of course in accordance with LAR 145(e). Upon the failure of the successful bidder to pay the balance of the purchase price as and when due, the entire deposit shall be forfeited and applied toward administrative costs, and any excess shall be applied toward satisfaction of the liens upon the Vessel according to their priority as later established.

(b) Plaintiff may bid all or part of its judgment *in rem* against the Vessel in lieu of cash at the Marshal's sale of the Vessel, and, if it is the successful bidder, it shall be required to deposit and pay in cash or by a cashier's or certified check as aforesaid, only so much of its bid as shall exceed the amount of its judgment *in rem*, but in no event shall this amount be less than a sum sufficient to secure the outstanding Marshal's fees, costs, and commission. Plaintiff must pay such amount within 10 days after said fees, costs, and commission have been determined and notice thereof has been received by plaintiff. Plaintiff agrees and has stipulated to pay any and all lien claims against the Vessel to the extent and in the amounts that this Court determines are valid and enforceable liens thereon and senior in priority to plaintiff's preferred mortgage lien. Should any of the parties to this action claiming a lien on the Vessel senior in priority to the plaintiff's lien object, prior to five days in advance of the Marshal's sale, to the plaintiff's bidding all or part of its judgment in lieu of cash, the

right to so bid shall be further conditioned upon either (i) the posting by the plaintiff of a corporate surety bond in form acceptable to the Court, or (ii) the filing of an undertaking by plaintiff in form satisfactory to such objecting party or parties, to pay the amount of the lesser of (1) the sum of the valid claim or claims of such objecting parties of lien or liens that are senior in priority to the plaintiff's lien, or (2) the amount of plaintiff's lien on the Vessel for which judgment is awarded herein and which plaintiff bids on a credit basis for the purchase of the Vessel, *provided,* that if any party suffers damages or incurs expenses because of such an objection and if the court determines that the objection is in violation of GR 3(d), Local Rules W.D. Wash., or that it is made based on a claim of lien priority that is incorrect, then the Court may tax as costs against the relevant objecting party or parties a sum equal to such damages or expenses, including the cost of the surety bond or bonds, to the extent they are caused hereby.

(c) The Vessel shall not be sold to any person not eligible to purchase it pursuant to 46 U.S.C. § 31329.

(d) Prospective bidders, upon application to the Marshal and prior notice to the attorneys for plaintiff (Bogle & Gates), and at such times and in such manner as the Marshal may direct, may board the Vessel for the purpose of inspection, provided that it shall be at the sole expense and risk of such person or his representative.

5. The Marshall shall bring the proceeds of the sale into Court and deposit the same with the Clerk, pending further order of this Court. All liens upon the Vessel adjudged valid and enforceable by the Court shall attach to the proceeds thereof in the same relative priorities which they enjoyed when they attached to the Vessel, and the Vessel shall thereupon be free and clear of all liens and encumbrances whatsoever.

6. Plaintiff may file a cost bill with the Clerk of the Court for interest, expenses, costs, and attorneys' fees as provided for herein at any time before seeking a judgment or order for distribution of sale proceeds, or further liquidating amounts described herein or any deficiency owing on its claim after the proceeds of the sale of the Vessel have been credited toward the claim.

7. There is no just reason for delay in the entry of the foregoing judgment, and the Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.